UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
ADVENTURE MEDIA & EVENTS, LLC

          Plaintiff,

     -v-

CHARLENE OLIVER DELOACH,

          Defendant.
```

26-cv-1858 (JSR)

OPINION & ORDER

JED S. RAKOFF, U.S.D.J.:

On May 6, 2026, by bottom-line order, the Court granted the motion of defendant Charlene Oliver DeLoach ("DeLoach") to dismiss plaintiff's complaint for lack of personal jurisdiction under Federal Rule of Civil Procedure 12(b)(2). See ECF No. 18. This Opinion & Order sets forth the reasons for that decision and directs the entry of final judgment.

## I.    Background

Plaintiff Adventure Media and Events, LLC ("Adventure Media") is New York-based company that operates in the children's toy market. First Amended Compl. ("FAC") ¶¶ 4, 6. Among other things, Adventure Media provides news, information, and product reviews for various children's toys and games through its Toy Insider website and its Toy Book magazine. Id. ¶¶ 7, 10. Adventure Media also hosts annual events in New York City for toy manufacturers and vendors to highlight their products to consumers, press and digital influencers. Id. ¶ 8.

Adventure Media holds federal trademarks in the word marks "The Toy Book" and "The Toy Insider" and in the service mark "Sweet Suite"

1

and currently has a trademark application pending for the service mark "Holiday of Play." Id. ¶ 11. Adventure Media uses these marks and associated symbols to promote its events and services. See id. ¶¶ 8-9. It has also long used the hashtag "#HoliPlay" to promote its Holiday of Play event and its annual Holiday Guide. Id. ¶ 9.

Between 2012 and November 2024, DeLoach, an individual who resides in Massachusetts, performed work for Adventure Media under a series of independent contractor agreements. Id. ¶¶ 5, 12. DeLoach's work included authoring posts for Toy Insider and Toy Book, planning and administering the Holiday of Play event, and making media appearances on behalf of Adventure Media, among other things. Id. ¶ 13.

From 2012 to 2020, DeLoach annually attended the New York City Toy Fair, a yearly trade event for the North American toy industry, where she promoted her consulting, marketing, and event planning services to toy industry participants. Id. ¶ 14; DeLoach Decl. ¶ 19, ECF No. 18-1. Since her final contract with Adventure Media expired at the end of December 2024, DeLoach has continued to offer and sell substantially similar services to companies in the toy industry. FAC ¶ 15. DeLoach attended the New York City Toy Fair once more in 2025. DeLoach Decl. ¶ 20; see also FAC ¶ 14. S

Additionally, in or around March 2026, DeLoach posted at least two messages on her LinkedIn page promoting her work to attendees of this year's Toy Fair (which, as always, is in New York). See FAC ¶ 16 ("If you're at TOY FAIR and this resonates, let's chat."); ¶ 17 ("Very few people in this space can offer that kind of distribution pipeline,

and I'm bringing all of it to TOY FAIR this weekend. If you're looking for a partner who can take your story and amplify it across every platform . . . let's talk.").

On March 6, 2026, Adventure Media filed suit against DeLoach, asserting claims of trademark infringement and unfair competition. Adventure Media alleges that, since its contractual relationship with DeLoach ended, she has continued to use and display its trademarks, without Adventure Media's authorization, in connection with her own toy-related business ventures, creating the false impression that she remains affiliated with or endorsed by Adventure Media. Id. ¶ 20. Specifically, DeLoach's various self-promotional websites display or, until recently, displayed Adventure Media's Toy Insider and Toy Book trademarks, as well as video clips of media appearances that DeLoach made on Adventure Media's behalf, which also display its marks. Id. ¶¶ 21-24. Adventure Media also alleges that DeLoach infringed its "Holiday of Play" and "Holiplay" marks by staging an event in November 2025 called the "HoliPlay Summit." Id. ¶ 25.

On April 15, 2026, DeLoach moved to dismiss the action for lack of personal jurisdiction. After considering the parties' briefs and the arguments of counsel at the April 29, 2026 oral argument, the Court granted the motion to dismiss. The Court now sets forth the reasons for that decision.

## II.  Discussion

To exercise personal jurisdiction over a defendant, there must be a statutory basis and the exercise of personal jurisdiction must

comport with constitutional due process. <u>Licci ex rel. Licci v. Lebanese Canadian Bank, SAL</u>, 673 F.3d 50, 59-60 (2d Cir. 2012). On a motion to dismiss, the plaintiff "need only make a prima facie showing of personal jurisdiction over the defendant[]." <u>Sullivan v. UBS AG</u>, 149 F.4th 206, 217 (2d Cir. 2025). This requires "an averment of facts that, if credited by the ultimate trier of fact, would suffice to establish jurisdiction over the defendant." <u>Chloé v. Queen Bee of Beverly Hills, LLC</u>, 616 F.3d 158, 163 (2d Cir. 2010).

## A. Statutory Jurisdiction

Whether there exists a statutory basis for personal jurisdiction is "determined by the law of the state in which the court is located" -- here, New York law. <u>Spiegel v. Schulmann</u>, 604 F.3d 72, 76 (2d Cir. 2010). Adventure Media asserts that the Court has personal jurisdiction over DeLoach under several provisions of New York law. The Court takes each in turn.

### 1. C.P.L.R. § 302(a)(3) (Specific Jurisdiction)

Adventure Media first points to C.P.L.R. § 302(a)(3), which has two sub-parts.[1] It argues that the Court may exercise personal

---

[1] Adventure Media, in its brief, did not advance any argument that the Court has personal jurisdiction over DeLoach under any of the other subsections of C.P.L.R. § 302. At oral argument, Adventure Media suggested that the Court might also exercise personal jurisdiction over DeLoach under C.P.L.R. § 302(a)(1), which subjects to New York's jurisdiction anyone who "transacts any business within the state." But Adventure Media nowhere raised § 302(a)(1) in its opposition to defendant's motion to dismiss and therefore any argument that the Court may exercise personal jurisdiction over DeLoach based on that provision was abandoned for failure to raise it in the opposition

jurisdiction over DeLoach under either sub-part. Section 302(a)(3) provides, in relevant part, that

> (a) . . . . a court may exercise personal jurisdiction over any non-domiciliary . . . who . . . .
>> (3) commits a tortious act without the state causing injury to person or property within the state, except as to a cause of action for defamation of character arising from the act, if he
>>> (i) regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered, in the state, or
>>> (ii) expects or should reasonably expect the act to have consequences in the state and derives substantial revenue from interstate or international commerce . . . .

N.Y. C.P.L.R. § 302(a)(3)(i)-(ii).

Under either subsection of § 302(a)(3), the plaintiff must allege an in-state injury caused by an out-of-state tort. See Sybron Corp. v. Wetzel, 385 N.E.2d 1055, 1058 (N.Y. 1978). The parties agree that the alleged infringement took place out of state but disagree about whether the situs of the injury allegedly caused by the alleged infringement is in New York.

It is "well-settled" that, as a general matter, the "residence or domicile of the injured party within [New York]" is not a "sufficient predicate" to establish that an injury took place in New York for the purposes of § 302(a)(3). Troma Ent., Inc. v. Centennial

---

brief. See Curry Mgmt. Corp. v. JPMorgan Chase Bank, N.A., 643 F. Supp. 3d 421, 426 (S.D.N.Y. 2022).

Pictures, Inc., 729 F.3d 215, 218 (2d Cir. 2013). However, in Penguin Group (USA), Inc v. American Buddha ("Penguin II), 946 N.E.2d 159 (N.Y. 2011), the New York Court of Appeals held that, under certain circumstances, the situs of the injury in an intellectual property case is best understood to be the domicile or location of the intellectual property holder.

Penguin II involved allegations by a New York-based publisher that the defendant, American Buddha, had infringed its copyrights in several books by uploading copies of the books to the internet. The Court's conclusion that the situs of the injury in that case was the location of the copyright holder was based on "the convergence of two factors." Penguin II, 946 N.E.2d at 163. First, the Court reasoned that the nature of the alleged infringement made "the place of uploading largely 'inconsequential.'" Troma Ent., 729 F.3d at 219 (quoting Penguin II, 946 N.E.2d at 164). Because the copyrighted works were uploaded to the internet "for anyone, in New York or elsewhere, with an Internet connection" to access, "the injury occasioned by [the] uploading [was] so widely dispersed" and, as a result, "the out-of-state location of the infringing conduct . . . carrie[d] less weight in the jurisdictional inquiry." Id. (quoting Penguin II, 946 N.E.2d at 163-64).

Second, the Court emphasized "the unique bundle of rights granted to copyright holders." Penguin II, 946 N.E.2d at 164. In intellectual property cases, the injury caused by infringement is not limited to "indirect financial loss," but can also extend to "market confusion"

and the "diminution of the value of the rights themselves." Troma Ent., 729 F.3d at 219 (quoting Penguin II, 946 N.E.2d at 164). This sort of injury is distinguishable from the type of "derivative economic injury" that is typically insufficient to establish an in-state injury "based solely on the domicile of the plaintiff." Penguin II, 946 N.E.2d at 163 (citing Fantis Foods v. Standard Importing Co., 402 N.E.2d 122 (N.Y. 1980)). Taken together, these two factors -- the difficulty of localizing infringement that takes place over the internet combined with the "diverse ownership rights enjoyed by copyright holders" -- persuaded the Court that, in such a case, the alleged injury occurs in New York for the purposes of C.P.L.R. § 302(a)(3). Id. at 165.

This case is sufficiently comparable to Penguin II to fall within its ambit. First, DeLoach's alleged infringing activity took place over the internet on websites that are accessible to anyone with an internet connection and whose intended audience is not localized to any particular place. See FAC ¶¶ 20-26. DeLoach has done business through her websites with individuals located throughout the United States. See Ex. C, ECF No. 18-4. Second, Adventure Media does not rely solely on allegations of indirect financial loss, but rather, as in Penguin II, asserts less quantifiable injuries to its trademark rights in the form of consumer confusion and loss of goodwill. See FAC ¶¶ 28-29. Under these circumstances, the injury alleged here is best understood as having been suffered in New York, where Adventure Media, the trademark holder, is located.

However, it is not enough for the exercise of personal jurisdiction under § 302(a)(3) that the defendant commit a tort that caused an injury in New York. The plaintiff must also allege that the defendant either (i) "regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from . . . the state"; or (ii) "expects or should reasonably expect the act to have consequences in the state and derives substantial revenue from interstate or international commerce." N.Y. C.P.L.R. § 302(a)(3). Adventure Media has not plausibly alleged either.

Adventure Media argues that DeLoach is subject to the Court's jurisdiction under subsection (i) because she "regularly . . . solicits business" in New York state. Id. § 302(a)(3)(i).

Although the requirement of "regularity" has not been extensively defined, courts have explained that it requires "something more than the 'one shot' single business transaction" that suffices under § 302(a)(1) but less than "large quantity" of New York contacts necessary to establish general jurisdiction under § 301. Theraplant, LLC v. Makarechi, No. 16CV0646 (DLC), 2016 WL 7839186, at *3 (S.D.N.Y. Dec. 23, 2016) (quoting Ingraham v. Carroll, 90 N.Y.2d 592, 597 (1997)); Vista Food Exch., Inc. v. Champion Foodservice, LLC, 124 F. Supp. 3d 301, 307 (S.D.N.Y. 2015). In short, by imposing a requirement of "regular business," the New York legislature's aim was to limit § 302(a)(3)(i)'s reach to those with "sufficient contacts with [New York] state . . . that it is not unfair to require them to answer in

this state for injuries they cause by acts done elsewhere." Theraplant, LLC, 2016 WL 7839186, at *3 (quoting Ingraham, 90 N.Y.2d at 597). This fairness requirement is "more stringent" than the minimum contacts requirement necessitated by due process. Ingraham, 90 N.Y.2d at 597.

Adventure Media does not plausibly allege that DeLoach "regularly" solicits business in New York. It points to four categories of alleged conduct that it argues are sufficient to demonstrate DeLoach's "extensive solicitation efforts" directed at the New York toy market: (i) her attendance at the New York Toy Fair between 2012-2020 and in 2025; (ii) the use of her personal websites to "solicit and arrange" meetings with industry participants and to solicit participation in her "Holiplay Summit" event; (iii) her New York-based LinkedIn followers; and (iv) her use of her LinkedIn page to target Toy Fair attendees for meetings and to promote her services and events. See Pl. Opp. 8-9. None of these falls within the reach of New York's long-arm statute.

First, Adventure Media's allegations regarding DeLoach's websites are insufficient.[2] The complaint contains no allegations that any of DeLoach's personal websites targeted New York in any way. See FAC ¶¶ 13-19. The mere fact that her websites are accessible in New York state does not demonstrate that they "solicit[] business" in the state.

---

[2] Although a defendant's websites could be relevant to personal jurisdiction for a number of reasons, the Court's analysis of DeLoach's websites is limited to whether they satisfy the "regularly does or solicits business" prong of § 302(a)(3)(i), as § 302(a)(3) is the only subsection of New York's long-arm statute at issue here.

See Richtone Design Grp. L.L.C. v. Classical Pilates, Inc., No. 06 CIV. 0547 (NRB), 2006 WL 2588135, at *3 (S.D.N.Y. Aug. 21, 2006) ("[T]he fact that defendants' website is accessible to New York residents simply does not constitute the kind of conduct required under § 302(a)(e)(i)."); Telebyte, Inc. v. Kendaco, Inc., 105 F.Supp.2d 131, 136 (E.D.N.Y. 2000) ("[T]he mere existence of a web site accessible from New York is insufficient to establish 'solicitation' for purposes of personal jurisdiction."); Girls Scouts of U.S. v. Steir, 102 Fed. App'x 217, 220 (2d Cir. 2004) ("[T]he mere fact that [defendants'] website . . . is continuously accessible to New York residents does not establish the sort of persistent course of conduct" required under § 302(a)(e)(i)).

Second, Adventure Media's argument regarding the citizenship of DeLoach's LinkedIn followers is similarly lacking. For one thing, the assertion that a "substantial number" of DeLoach's LinkedIn followers are "likely" located in New York because of New York's status as "a toy 'epicenter'" is nothing more than a guess and is unsupported by any specific factual allegations in the complaint. Pl. Opp. 9. In any event, the fact that a person's social media posts are accessible to followers in a particular state (independent of evidence that those followers are being targeted in some way) does not, on its own, demonstrate solicitation of residents of that state. See DH Servs., LLC v. Positive Impact, Inc., No. 12 CIV. 6153 RA, 2014 WL 496875, at *12 (S.D.N.Y. Feb. 5, 2014) ("That individuals in New York can continuously access -- and, in a limited way, interact

with -- Defendant's website is insufficient to establish § 302(a)(3)(i) jurisdiction."); cf. Gilbert v. Indeed, Inc., 513 F. Supp. 32 374, 414-15 (S.D.N.Y. 2021) ("A social media user may have hundreds of connections and may thereafter ignore such connections once the request to connect is accepted. Such a user cannot be subject to personal jurisdiction of the residence of each state in which their connections reside.").

DeLoach's attendance at the New York Toy Fair and her two LinkedIn posts directed at attendees of the fair present somewhat closer questions. However, they ultimately do not demonstrate the type of regular, non-sporadic solicitation that would satisfy § 302(a)(3)(i). During the time period relevant to the complaint -- that is, starting in the end of December 2024, when DeLoach's final contract with Adventure Media expired, FAC ¶ 5 -- DeLoach attended the New York Toy Fair once, in 2025, as press. See DeLoach Decl. ¶ 19. Before that, the last time DeLoach had attended the Toy Fair was in 2020. Id. DeLoach's extremely limited presence in the state of New York -- even assuming that it is sufficient to constitute "solicit[ation]" of business -- does not demonstrate that she "regularly" solicits business in the state. See, e.g., AVRA Surgical Robotics, Inc. v. Gombert, 41 F. Supp. 3d 350, 356, 361 (S.D.N.Y. 2014) (defendant's single three-day visit to New York, where he participated in a fundraising effort that raised approximately $500,000 from New York investors, did not demonstrate "regularly do[ing] or solitic[ing] business" in the state).

11

Likewise, the amended complaint alleges that DeLoach made two LinkedIn posts in or around March 2026 that at least arguably solicit business from New York, given that they are directed to attendees of the Toy Fair in New York. See FAC ¶ 16("If you're at TOY FAIR . . . let's chat. Or DM me, to schedule time after the show, or just start the conversation."); id. ¶ 17 ("Very few people in this space can offer that kind of distribution pipeline, and I'm bringing all of it to TOY FAIR this weekend."). However, these two posts, made close in time and involving the same underlying event, are insufficient to demonstrate a regular course of conduct. Adventure Media therefore has not shown that DeLoach "regularly . . . solicits business" in New York such that § 302(a)(3)(i) reaches her conduct.

Next, Adventure Media argues that the Court has personal jurisdiction over DeLoach under subsection (ii). Among other things, for a defendant to be subject to personal jurisdiction under section 302(a)(3)(ii), the defendant must "derive[] substantial revenue from interstate or international commerce." N.Y. C.P.L.R. § 302(a)(3)(ii). Adventure Media has not shown that this is the case.

"There is no specific dollar threshold at which revenue becomes 'substantial' for purposes of C.P.L.R. § 302(a)(3)(ii)." Light v. Taylor, No. 05 CIV. 5003 WHP, 2007 WL 274798, at *4 (S.D.N.Y. Jan. 29, 2007), aff'd, 317 F. App'x 82 (2d Cir. 2009). Courts will assess the question on both relative and absolute scales; however, the amount of a defendant's interstate or international revenue in absolute terms is generally a more appropriate measure. See Ronar, Inc. v. Wallace,

12

649 F. Supp. 310, 316 (S.D.N.Y. 1986). Ultimately, each case must be judged on its own facts, among the most important of which are "the overall nature of defendant's business and the extent to which he can fairly be expected to defend lawsuits in foreign forums." Id. at 317.

Although DeLoach has derived some revenue from interstate commerce, that amount is far from any reasonably definition of "substantial." In 2025, DeLoach earned gross income in the amount of $638 from a total of fifteen transactions across her websites. DeLoach Decl. ¶¶ 7-9. In 2022, she earned $1,055 from two transactions, and in 2023, she earned $47 from a single transaction. Id. ¶¶ 30-31, 40. Thus far this year, she has earned $25 in affiliate commissions from Amazon. Id. ¶ 54. Although most of these transactions were interstate, they are, in absolute terms, far from substantial. See Ronar, Inc., 649 F. Supp. at 317 (as a matter of "common sense," defendant earning $6,500 in annual income from international sources for "intermittent personal services" did not earn "substantial" revenue from international commerce). Moreover, the mere fact that this revenue was -- in relative terms -- predominantly from interstate sources does not make it substantial, given the very small amounts at issue. Id. Indeed, the extremely modest scale of DeLoach's business hardly suggests that she is operating the sort of interstate or international enterprise from which she should "fairly be expected to defend lawsuits in foreign forums."[3] Id. at 316.

_____

    [3] Adventure Media argues that the fact that DeLoach obtained a trademark for "The Play Insider" is itself evidence that she "derives

13

Because Adventure Media has failed to meet its burden of establishing jurisdiction under any of the enumerated provisions of New York's long-arm statute, the Court need not separately determine whether exercising jurisdiction would be consistent with due process. AVRA Surgical Robotics, Inc. v. Gombert, 41 F. Supp. 3d 350, 362 (S.D.N.Y. 2014).

### 2. C.P.L.R. § 301 (General Jurisdiction)

In the alternative, Adventure Media argues that DeLoach is subject to New York's general jurisdiction. This argument is meritless. Even assuming C.P.L.R. § 301 would reach DeLoach,[4] the exercise of general jurisdiction over her plainly would not comport with due process. For an individual, the paradigm forum for the exercise of general jurisdiction is the individual's domicile." Goodyear Dunlop Tires Operations, S.A. v. Brown, 564 U.S. 915, 924 (2011); see also Reich v. Lopez, 858 F.3d 55, 63 (2d Cir. 2017) ("General jurisdiction over an individual comports with due process in the forum where he is 'at

_____

substantial revenue" from interstate commerce because a trademark registration can be obtained only for a mark used in interstate or foreign commerce. See Pl. Opp. 11. Even if the trademark is sufficient to establish that DeLoach does business in interstate commerce, it does not establish that her revenue from that business is "substantial."

[4] "Many courts in this District have expressed doubt that New York's 'doing business' test for the exercise of [general] jurisdiction remains viable after Daimler [AG v. Bauman, 571 U.S. 117 (2014)]." Owens v. Ronemus, No. 23 CIV. 3036 (PGG), 2024 WL 3105605, at *5 n.4 (S.D.N.Y. June 24, 2024), appeal dismissed (Nov. 26, 2024). The Court need not, however, address whether there is any daylight between § 301 and what due process requires because exercising general jurisdiction over DeLoach would not comport with the latter.

home,' meaning the place of 'domicile.'" (citation omitted)). Although the Second Circuit has left open the possibility that "[i]n an 'exceptional case,' an individual's contacts with a forum might be so extensive as to support general jurisdiction notwithstanding domicile elsewhere," it "has yet to find such a case." Reich, 858 F.3d at 63 (quoting Daimler AG v. Bauman, 571 U.S. 117, 139 (2014)).

In any event, this clearly is not that case. DeLoach is a resident of Massachusetts and her contacts with New York are limited to those described above. Her infrequent visits to New York and limited social media posts are in no way "exceptional" and do not render her at home in New York. See, e.g., Reich, 858 F.3d at 63 (declining to decide "whether it would ever be possible to exercise general jurisdiction over an individual in a forum other than the one in which he is domiciled" or to define such a an "exceptional case" because defendant's contacts with New York -- relationships with New York banks and law firms, property in New York, and consistent time spent in New York over a 31-month period -- did "not approach the point at which general jurisdiction . . . would comport with due process"). The Court therefore lacks general jurisdiction over DeLoach.

## III.  Conclusion

For the foregoing reasons, the Court reconfirms its "bottom-line" order granting defendant's motion to dismiss.

The Clerk of Court is respectfully directed to enter final judgment and to close the case.

SO ORDERED.

New York, NY
May 28, 2026

                                    JED S. RAKOFF, U.S.D.J.